IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DALE C. FRANKS, | ) | CASE NO. 3:11CV00153 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Dale C. Franks ("Franks") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for social

security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This matter has been referred to the undersigned Magistrate Judge for a Report and

Recommendation pursuant to Local Rule 72.2(b)(1).

Franks' arguments relate entirely to the Commissioner's determination that he was not

disabled between his alleged onset date of November 1, 2001 and October 22, 2007.  Pl's Brief

at 1, Doc. 1, ¶ 5.   Accordingly, this Report and Recommendation pertains to that period.

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

## I.  Procedural History

Franks filed an application for Disability Insurance Benefits ("DIB") and an application

for Supplemental Security Income Benefits ("SSI") on October 22, 2007, alleging a disability

onset date of November 1, 2001.  Tr. 101-105.  The state agency denied Franks' claims initially

on January 2, 2008 (Tr. 45-47) and upon reconsideration on February 19, 2008.  Tr. 48-49.  On

April 10, 2008, Franks requested a hearing (Tr. 50) and, on August 7, 2009, a hearing was held

before Administrative Law Judge Ronald J. Thomas (the "ALJ").  Tr. 20-42.

      In a decision dated September 18, 2009, the ALJ determined that, prior to October 22,

2007, Franks was not disabled but, beginning on October 22, 2007, Franks became disabled and

continued to be disabled through the date of the ALJ's decision.  Tr. 7-19.  The effect of the

ALJ's decision was to deny Franks any DIB but to allow him SSI commencing October 22,

2007. [1]  Franks requested review of the unfavorable portion of the ALJ's decision by the Appeals

Council (Tr. 6) and filed a supporting memorandum.  Tr. 218-224.  On November 19, 2010, the

Appeals Council denied Franks' request for review, making the ALJ's decision the final decision

of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.  Personal and Vocational Evidence

      Franks was born on January 8, 1952.  Tr. 101, 103, 106.  His work experience includes

work as a machine builder/model designer, a machine operator, a maintenance crewmember and

maintenance/custodial worker.  Tr. 134, 141, 156, 209.  The record evidence indicates that

Franks last worked in 2007.  Tr. 243.  In 2007, Franks reported to Dr. Kresge that he had been

working part-time in a bowling alley and also in a bar.  Tr. 243.  Franks completed the 10th grade

(Tr. 18, 25) and, prior to his wife becoming ill around 2007, he had started to work towards

obtaining his GED and a degree in CAD design.  Tr. 33.  Franks is married with one adult child,

and he lives with his wife.  Tr. 23-24.  Franks performs some household chores but testified that

it is not easy.  Tr. 36.  He runs the vacuum while sitting on the couch and takes the laundry

---

[1] In order to be eligible for DIB, a claimant's disability must begin before his date last insured.  42 U.S.C. § 423; 20 C.F.R. § 404.131(a), 404.320(b)(2); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) .  Franks' date last insured was December 31, 2004.  The ALJ did not explain why he selected October 22, 2007, as the date on which Franks became disabled.  However, that was the date when he filed his application and it appears that he would not be eligible to receive SSI benefits before that date.  20 C.F.R. § 416.501

downstairs by walking down the stairs backwards and dragging the laundry basket down each

step in front of him.  Tr. 36.  His son does lawn work for Franks and his wife.  Tr. 36.

Franks testified that he used to belong to the Eagles club but, because of financial

problems, he had to quit his membership.  Tr. 39.  He attends church on Sundays.  Tr. 39.  His

church is about a half a mile away from his home.  Tr. 39.  He testified that he drives rather than

walks to church because it is easier.  Tr. 39.  He used to enjoy playing softball, bowling, playing

pool, shooting darts, fishing and swimming, but also testified that he had not been able to engage

in those activities for about the past five years. Tr. 39.

**B.     Medical Evidence**

     **1.     Medical evidence**

          **a.     Treating Physicians**

          ***Gary D. Kresge, D.O.***

Dr. Gary D. Kresge, D.O. ("Kresge") began treating Franks for a knee injury in 2002.  Tr.

244-261.  X-rays taken in September 2002 revealed significant arthritic changes with significant

narrowing of the medial joint space and spurring on the lateral and medial tibial ridges and the

medial and lateral femoral condyles.  Tr. 260.  Kresge opined that Franks had degenerative

arthritis of the knee and probable torn medial meniscus which was unstable.  Tr. 260.  On

October 9, 2002, Franks reported that his knee was feeling better but noted that his back was

now bothering him, and he was still apprehensive about his knee giving out.  Tr. 260. After

further follow up with continuing knee problems, Kresge recommended surgical intervention

and, on November 5, 2002, he performed arthroscopic surgery on Franks' right knee.  Tr. 258-

260.

In June, 2003, during a follow up with Kresge, Franks indicated that, although he was having increased pain in his right knee, he had been more active and was back doing his job as a mechanic which required a lot of bending and stooping and kneeling.  Tr. 256.  Alternatives, including injection therapy and weight loss, were discussed at a June 4, 2003, appointment.  Tr. 255.

At a follow up in November, 2003, Franks advised Kresge that the Synvisc injections were definitely helping.  Tr. 253.  Franks was still experiencing some soreness in the back of his knee but most of the pain in the medial aspect of the knee and the front of the knee was gone. Tr. 253.  Franks advised Kresge that he was still having problems with his right knee giving out on him.  Tr. 253.  He indicated he had fallen forward on his right knee and that the fall caused increased pain.  Tr. 253.  However, he reported that he was still working as a mechanic and doing a lot of knee squatting, kneeling and bending.  Tr. 253.

On June 30, 2004, Kresge saw Franks following an injury to his knee that occurred while Franks was stepping out of a car that he was working on.  Tr. 252.  Franks reported that the Synvisc injections that were completed in September 2003 had provided significant relief up until he injured himself.  Tr. 252.  Further, Franks reported that he had been working eight to ten hour days.  Tr. 252.  Kresge diagnosed Franks with a sprain/strain and ongoing degenerative process in the medial compartment and a possible DVT.  Tr. 252.  Kresge recommended an ultrasound and, in July 2004, the results of the ultrasound were negative.  Tr. 251.  Therefore, the recommended course of treatment was further Synvisc injections rather than knee replacement, a regular exercise program for strengthening, switching from Celebrex to Vioxx[2] to see if Franks could get more symptomatic relief, and continued Vicodin.  Tr. 251

---

[2] In October, 2004, Franks was switched back from Vioxx to Celebrex.  Tr. 250.

Through 2005, Franks continued to receive refills of pain medication and Kresge saw him again on March 2, 2006, for a reevaluation of his right knee. Tr. 249-250. Franks reported that his right knee was continuing to bother him. Tr. 249. Additionally, he reported that his left knee was bothering him. Tr. 249. He reported having to use a scooter to ride around on when he went to the store. Tr. 249. Kersge advised Franks that he would not perform knee replacement surgery until Franks lost weight. Tr. 249. Franks received an Orthovisc supplementation injection at the March 2, 2006, appointment. Tr. 249. Franks received repeat injections on March 9, 2006 and March 16, 2006. Tr. 248.

Kresge next saw Franks on July 13, 2006, for complaints of bilateral knee pain, low back and hip pain, calves and feet. Tr. 247. Kresge diagnosed Franks with plantar fibromatosis; severe degenerative arthritis of the right knee, medial compartment; moderate degenerative arthritis of the left knee; chronic lumbar arthrosis; bilateral bunion deformities and hammertoe deformity. Tr. 246. Kresge recommended surgery for the plantar fibromatosis but not for the knee or hammertoe and bunion deformities. Tr. 246. Kresge referred Franks to a specialist for a recommendation whether knee replacement surgery should be considered notwithstanding Franks' obesity and age. Tr. 246. Regarding Franks' complaints of back pain, Kresge indicated that, other than weight loss, he had no recommendation for effective treatment. Tr. 246.

In November, 2006, Franks received another injection. Tr. 245. He reported that he was becoming much more active. Tr. 245. He had a job bartending and was working in a boat yard pulling boats in and out of the water and reported being on his feet for maybe twenty to thirty hours a week. Tr. 245. On exam of Franks' knee, Kresge noted a reduced range of motion and marked pain to the medial joint line of the right knee. Tr. 245. Franks' knee brace wore out and Kresge determined that it was too small because Franks had gained weight. Tr. 245. Kresge

ordered a new brace.  Tr. 245.  Franks received a second and third injection on November 27, 2006, and December 4, 2006.

On January 22, 2007, Franks saw Kresge again to discuss his increased symptomatology of the right knee.  Tr. 243.  Franks reported that his pain level in the right knee was generally a 2 or 3 and occasionally went up to a level 5 or 6.  Tr. 243.  Franks reported that he was working part-time in a bowling alley and also in a bar.  Tr. 243.  He indicated he was also being treated by Dr. Furlong who had prescribed aqua therapy for the knee and to assist with weight loss.  Tr. 243.  Franks was unable to see a specialist recommended by Kresge in 2006 because the specialist was "out of network." However, Kresge indicated that Kresge would consider performing a knee replacement surgery.  Tr. 243.

### ***Robert S. Reeves, M.D.***

Franks began seeing Dr. Robert S. Reeves, M.D. ("Reeves") in May 2008.  Pl's Brief at 5.  Reeves completed a Medical Source Statement in 2008 wherein he noted various restrictions and limitations.  Tr. 441-446.  In his brief, Franks summarizes Reeves' reports and highlights a 2008 Medical Source Statement completed by Reeves.  Pl's Brief at 5-6.  However, Franks does not explain how Reeves' reports support his argument that he was disabled prior to his date last insured, i.e., December 31, 2004.

### b.    Agency Reviewing Physicians

On February 15, 2008, Kathryn Drew, M.D. ("Drew") reviewed Franks' medical file and assessed his RFC.  Tr. 275-283.  Drew opined that Franks had the capacity for light work, i.e., he had the ability to lift/carry up to twenty pounds occasionally and ten pounds frequently, ability to stand/walk for six hours in an eight hour workday and to sit for six hours in an eight hour workday, and an unlimited ability to push/pull (other than limitations noted for lift/carry).  Tr.

276.  She also indicated that Franks had the following postural limitations:  occasional climbing

of ramps or stairs, occasional balancing, kneeling, crouching and crawling, and never climbing

ladders, ropes or scaffolds.  Tr. 277.  Drew noted that there was insufficient evidence prior to

December 31, 2004 (the date last insured), and that there was no information regarding

emphysema or of a fractured vertebrae.  Tr. 276.  Drew did note, however, that there was

evidence of morbid obesity, severe joint space narrowing in the right knee with loss of motion,

pain, a mildly antalgic gait, and obstructive sleep apnea with benefit from CPAP and oxygen.

Tr. 276.  It was Drew's opinion that the knee problems and obesity caused the stated exertional

limitations and postural limitations that she found.  Tr. 276.  Regarding the consistency of

Franks' alleged symptoms with the total medical and non-medical evidence, Drew opined that,

because Franks' date last insured was three years prior to her review and because his disease was

progressive in nature and had likely gotten worse with time, his allegations at the time of her

review were not relevant.  Tr. 280.

### c.    Other physicians and/or assessors

In 1979, while working at the Cleveland Metroparks, Franks was involved in an ATV

accident.  Tr. 299, 301, 303.  He was thrown out of a vehicle and the vehicle landed on his back.

Tr. 299, 301, 303.  A workers compensation claim was originally allowed for right hip, back and

contusion to the chest.  Tr. 299.  Following that injury, Franks was seen by a number of doctors

in connection with his workers compensation claim, including Dr. Robert D. Zaas, M.D. in 1981

(Tr. 292-293), Dr. Gilbert Gross, M.D. in 1986 (Tr. 299-300), and Dr. George Smirnoff, M.D. in

1992 (Tr. 303-304).[3]  These visits preceded Franks' date last insured, i.e., December 31, 2004,

as well as Franks' alleged onset date, i.e., November 1, 2001.  None of these doctors opined that

---

[3] These are the doctors Franks refers to in his brief (Pl's Brief at 3-4) but they are not all the doctors who saw Franks in connection with his workers compensation claim.

7

Franks was disabled such that he was unable to perform light work during the time period relevant to this Court's review.

During the years 2003 through 2007, Franks participated in sleep studies at Firelands Regional Medical Center in relation to his sleep apnea.  Tr. 231-241, 312-334.  Firelands' reports noted that Franks' sleep apnea improved with CPAP treatments and that Franks reported feeling better and did not think oxygen was necessary.  Tr.  314, 317.

In December 2007, a functional capacity evaluation was performed at the request of Dr. Dennis Furlong.  Tr. 376-379.   In January 2008, a vocational evaluation was completed based on a referral from Franks' Bureau of Vocational Rehabilitation counselor.  Tr. 424.  In 2008, Franks saw Dr. Brendan Bauer, M.D., for a neurological consult regarding his back pain and Franks was then referred to Dr. John Collis, M.D., for a surgical consult.  Tr.  448-453.   In his brief, Franks summarizes Reeves' reports and highlights a 2008 Medical Source Statement completed by Reeves.  Pl's Brief at 6-7.  These evaluations and consultations, however, do not precede Frank's date last insured, i.e., December 31, 2004, and Franks does not explain how these evaluations and consultations support his argument that he was disabled prior to his date last insured.

### C.    Testimonial Evidence

### 1.    Franks' Testimony

Franks testified that his weight has always been a factor in his health problems[4] and that he first injured his back at work in 1979.  Tr. 27.  That injury led to a workers compensation claim for his hip and back.  Tr. 27.  Franks also testified that he injured his knee in 1995 in a car accident.  Tr. 28.

Franks testified that his doctors would not approve surgery on his back because he was a smoker and overweight.  Tr. 27.  He indicated that he has learned to live with the pain and "work

---

[4] Franks testified that he weighed 348 pounds and was 5'6" at the time of the hearing.  Tr. 28.

through it." Tr. 27.  As for his knee, over the years his knee injury worsened and, ultimately, in 2002, he had arthroscopic surgery and lubricating shots.  Tr. 29.  As with his back injury, Franks testified that the doctors would not approve knee replacement surgery because he is overweight and smokes.  Tr. 29.  Franks uses a knee brace and testified that he can lift about 10-15 pounds. Tr. 27.  Franks testified that he takes prescribed medications for pain and other ailments.  Tr. 28. Specifically, he testified that he uses a 100-milligram patch of Fentanyl every three days, Celebrex twice a day, Neurontin four times a day, Lorcet pain pills every six hours, as needed, a blood pressure pill and a water pill for swelling in the legs.  Tr. 28.  Franks also testified that he takes Prozac and Xanax for anxiety and depression and medicine for hypertension.  Tr. 35-35.

On a scale of zero to ten, zero being no pain, Franks rates his pain level in his back on a bad day as an eight to nine and, on a good day, a two to three.  Tr. 30.  During a typical week, Franks testified that he has on average four bad days and three good days.  Tr. 30.  According to Franks, how he feels each day or each week is dependent upon the amount of medication that he takes and how much he exerts himself.  Tr. 30-31.  Franks testified that standing or stooping and walking up and down steps makes his back pain worse.  Tr. 31.  Franks never uses a cane but uses railings on steps.  Tr. 31.  Other than medication, Franks does get some relief from the back pain by sitting with his feet elevated.  Tr. 31.  Franks tries to avoid pushing and pulling because it hurts when he does so.  Tr. 31-32.  He also has difficulty reaching forward or reaching overhead.  Tr. 32.  Until his wife became ill around 2007, she assisted Franks with putting his socks and shoes on but Franks now has to assist her with almost everything.  Tr. 32.

Franks testified that he has breathing problems.  Tr. 29.  At night he has to wear a CPAP because of a lack of oxygen.  Tr. 29.  Franks also uses two inhalers and takes medication for his

breathing condition.  Tr. 29, 35.  Franks indicated that he has been diagnosed with sleep apnea and has been admitted for a couple of sleep labs.  Tr. 29.

Franks testified that he cannot be around strong solvents because that bothers his breathing.  Tr. 37.  Cold temperatures bother him but he did not know if his aversion to cold temperatures was related to his condition or simply his age.  Tr. 38.  Franks testified that, with medication, elevation of his legs and use of the CPAP, he usually sleeps eight to nine hours each night.  Tr. 38.

### 2.    Vocational Expert's Testimony

No vocational expert testified at the hearing.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his September 18, 2009 decision, the ALJ found that Franks met the insured status requirement through December 31, 2004.  Tr. 13.  The ALJ determined that Franks had not engaged in substantial gainful activity since October 22, 2007, the alleged onset date.[5]  Tr. 13.

---

[5] The ALJ's decision refers to alleged onset dates that are inconsistent with each other and that differ from Franks' alleged onset date of November 1, 2001.  Tr. 2.  The ALJ's second finding suggests an alleged onset date of October 22, 2007 (Tr. 13) while his fourth finding indicates an alleged onset date of January 1, 2002.  Tr. 13.  Franks footnotes the inconsistency (Pl's Brief at 1, FN1) but has not asserted it as an error.

The ALJ found that Franks has the following severe impairments: status post arthroscopy of the right knee in November 2002, right knee pain due to degenerative arthritis, left knee pain due to moderate degenerative arthritis, low back pain, obstructive sleep apnea and obesity.  Tr. 13.  The ALJ also found that, since the alleged onset date, Franks has not had an impairment or combination of impairments that met or medically equaled one of the listed impairments.[6]

The ALJ then determined that, prior to October 22, 2007, Franks had the residual functional capacity ("RFC") to perform a full range of light work as defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b).  Tr. 14-16.  The ALJ determined that, since January 1, 2002, Franks has been unable to perform any past relevant work because the demands of his past relevant work exceed the RFC. Tr. 17.  The ALJ found that, prior to the "established disability onset date," Franks was a younger individual age 18-49 but, since the established disability onset date, Franks' age category changed to an individual of advanced age.  Tr. 17.[7]  Based on this RFC and considering Franks' age, education, and work experience, the ALJ determined that a finding of "not disabled" is directed by Medical-Vocational Rule 202.17.[8] Tr. 18.

Beginning on October 22, 2007, the ALJ determined that Franks had the RFC to perform less than sedentary work.  Tr. 16.  The ALJ determined that Franks cannot physically sustain a regular and continuous competitive work activity for 8 hours a day, 40 hours a week.  Tr. 16.

---

[6] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[7] In the ALJ's findings relative to Franks' age, the ALJ referred to the "established disability onset date" rather than the "alleged disability onset date."  Tr. 17.  As noted in FN 5, the ALJ's decision includes unclear and at times inconsistent references to "onset date."

[8] The Medical-Vocational Guidelines, known as the "Grid," are located at 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grid"). The Grid is composed of Rules 200.01-204.00.  Id.  The Grid includes rules that may be applied in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work.  20 C.F.R. § 404.1569.  However, the rules contained in the Grid do not cover all possible variations of factors.  Id.

Based on this RFC and considering Franks' age, education, and work experience, the ALJ determined that there are no jobs that exist in significant numbers in the national economy that Franks can perform.  Tr. 18.

Based on the foregoing, the ALJ determined that Franks was not disabled prior to October 22, 2007, but became disabled on October 22, 2007, and continued to be disabled through the date of the ALJ's decision.  Tr. 18-19.

## V. Parties' Arguments

**A.    Plaintiff's Arguments**

First, Franks argues that the ALJ erred in relying on the state agency reviewing physician's ("Drew's) opinion for the period prior to October 22, 2007, because that opinion was not based on sufficient evidence.  Pl's Brief at 1, 9-11.

Second, Franks argues that the ALJ erred by ignoring Franks' postural limitations contained in Drew's opinion when making his decision that Franks was not disabled prior to October 22, 2007, and, and as a consequence, improperly used the Grid.  Tr. 12-13.

**B.    Defendant's Arguments**

First, the Commissioner argues that there is substantial evidence to support the ALJ's RFC findings, credibility findings and the weight the ALJ gave to the medical source opinions. Def's Brief at 7-10.

Second, the Commissioner argues that an ALJ may rely on the Grid to meet the Commissioner's burden of showing that there are jobs that exist in significant numbers in the economy that a claimant can perform, consistent with his or her RFC and age, education and work experience.  Def's Brief at 10.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence, or indeed, a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Franks v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.      **The ALJ's RFC assessment for the period prior to October 22, 2007, is supported by substantial evidence.**

Franks argues that the ALJ improperly relied upon the opinion of Drew, the state agency reviewing physician, and failed to consider the record as a whole when determining that, prior to October 22, 2007, Franks had the RFC to perform a full range of light work and was not disabled.  Pl's Brief at 9-11.  Franks claims that, because Drew's report indicates that Drew did

14

not have evidence concerning Franks' back problems, the ALJ should not have relied on her opinion.  Pl's Brief at 10.

While it is correct that Drew's report notes that she had insufficient evidence prior to Franks' date last insured and no information concerning emphysema or a fractured vertebrae, Drew did have evidence regarding Franks' obesity and knee injury and, based upon a review of the evidence that she did have, Drew opined that, prior to Franks' date last insured, he would at least have the limitations she noted, i.e., light work with some postural limitations.[9]  Tr. 275-283. Accordingly, although Drew did indicate that there was insufficient evidence, she did base her opinion on a review of medical evidence and the ALJ was not precluded from considering this opinion.  20 C.F.R. 404.1527(f).

Furthermore, contrary to Franks' argument, the ALJ did not give more weight to Drew, a non-examining physician, than to Kresge, Franks' treating physician.[10]  Franks fails to acknowledge that the ALJ relied upon Kresge in reaching his ultimate determination that there was little objective medical evidence to support Franks' subjective complaints that, prior to October, 2007 he had complete functional incapacity.  Tr. 15-16.  The ALJ provided a substantial review of Kresge's treatment of Franks.  Tr. 15-16.  Kresge's medical records document that, notwithstanding some pain, Franks remained active and injections were providing Franks with relief.  Tr. 252, 256.  More specifically, in June 2003, during a follow up with Kresge, Franks indicated that, although he was having increased pain in his right knee, he had been more active and was back doing his job as a mechanic, which required a lot of bending, stooping and kneeling.  Tr. 256.  Also, in 2004, Franks reported to Kresge that Synvisc injections

---

[9] The postural limitations noted by Drew include: never climbing ladders, ropes, or scaffolds, and only occasionally climbing ramps and stairs, balancing, kneeling, crouching or crawling.  Tr. 277.

[10] Franks only briefly mentions Kresge in a footnote (Pl's Brief at 5) although he was treated by Kresge for many years.

that were completed in September 2003 had provided significant relief.  Tr. 252.  The reports

from this period of time fall within the relevant time period of Franks' alleged onset date of

November 1, 2001 and December 31, 2004, his date last insured.

Additional evidence relied upon by the ALJ in determining that Franks was capable of

performing a full range of light work prior to October 22, 2007, included sleep lab study reports

that indicated Franks was sleeping eight to nine hours each evening with use of the CPAP

machine,but without the need for oxygen.  Tr. 15.  The ALJ also considered Franks' subjective

complaints.  Tr. 14-16.

A review of all of the evidence relied upon by the ALJ to reach his determination that,

prior to October 22, 2007, Franks was capable of performing a full range of light work,

demonstrates that the ALJ's findings are supported by substantial evidence and therefore should

be upheld. *See McClanahan*, 474 F.3d at 833.  Furthermore, even though the ALJ did not

specifically identify X-rays from 1980 or workers compensation related examinations from the

late 1980's and early 1990's, this evidence is remote in time to Franks' alleged onset date of

November 1, 2001.  Even if this remote evidence that Franks relies upon were deemed to be

substantial evidence, this Court cannot overturn the Commissioner's decision "so long as

substantial evidence also supports the conclusion reached by the ALJ."  *See Harrison*, 336 F.3d

at 477.

For the reasons set forth above, the ALJ's findings relative to Franks' RFC prior to

October 22, 2007, are supported by substantial evidence.  Therefore, Franks' first argument is

without merit.

**B.      The ALJ's use of the Grid for the period prior to October 22, 2007, was proper.**

As noted by the Commissioner, once it has been determined that a claimant cannot

perform his past relevant work, the burden shifts to the agency to show that there are other jobs

in significant numbers in the economy that the claimant can perform, consistent with his or her

RFC and vocational factors of age, education and work experience.  *Cole v. Secretary of Health*

*and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).  "The Commissioner may meet this

burden by reference to the medical vocational guidelines ("the grids") unless the claimant suffers

from nonexertional limitations that significantly limit the range of work permitted by his

exertional limitations." *Id. See also Kimbrough v. Secretary of Health and Human Services*, 801

F.2d 794, 796 (6th Cir. 1986) (finding that "it is only when the nonexertional limitation restricts a

claimant's performance of a full range of work at the appropriate residual functional capacity

that nonexertional limitations must be taken into account and a nonguideline determination

made.").   In order to foreclose use of the Grid, a claimant must demonstrate that nonexertional

limitations significantly limit his or her ability to perform a full range of work at the designated

level.  *Id.  See also  Shelman v. Secretary of Health and Human Services*, 821 F.2d 316, 321 (6th

Cir. 1987) (finding that "[r]eliance upon the grids in the presence of nonexertional limitations

requires reliable evidence of some kind that the claimant's nonexertional limitations do not

significantly limit the range of work permitted by his exertional limitations").

Drew's report includes postural (nonexertional) limitations of: never climbing ladders,

ropes, or scaffolds, and only occasionally climbing ramps and stairs, balancing, kneeling,

crouching or crawling (Tr. 277).  Although the ALJ did not specifically state that the postural

limitations noted by Drew were not severe enough to prevent Franks from performing a full

range of light work, the ALJ did ultimately establish an RFC without postural limitations.  Tr. 14.

As noted by the Commissioner, Social Security Ruling No. 83-14 provides that nonexertional limitations such as those found by Drew, i.e., ascending or descending scaffolding, poles and ropes, and crawling, have little or no effect on the unskilled light occupational base. Social Security Ruling No. 83-14, 1983 SSR LEXIS 33, *13 (Soc Sec. Admin. 1983). Moreover, Franks did not demonstrate how the postural limitations contained in Drew's report significantly limited his ability to perform a full range of light work and there is reliable evidence that the postural limitations did not significantly limit Franks from performing light work.  Tr. 15-16.  The ALJ specifically noted that, in 2003, Franks was working as a mechanic and doing a lot of knee squatting, kneeling, and bending (Tr. 15, 253).  Additionally, in 2006, Franks was becoming much more active, he was bartending and working in a boat yard pulling boats in and out of the water and was on his feet for perhaps 20 to 30 hours a week.  Tr. 16, 245.  Although not noted by the ALJ, the record evidence also documents that, in early 2007, Franks reported that he was working part-time in a bowling alley and also in a bar.  Tr. 243.

A review of the evidence and the ALJ's findings, along with Franks' lack of demonstration that postural limitations significantly limited his ability to perform a full range of light work prior to October 22, 2007, result in a recommendation that Franks' second argument is without merit.

### V. Conclusion and Recommendation

For the foregoing reasons, the undersigned finds that the ALJ applied the correct legal

standards and that the ALJ's decision is supported by substantial evidence.  Therefore, it is the

undersigned's recommendation that the Commissioner's decision be **AFFIRMED**.

Dated: January 10, 2012

_____
Kathleen B. Burke
United States Magistrate Judge


### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).